UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| **JAMES EVERARD,** | § | |
| **ANCA NEAGU,** | § | |
| **MICHAEL FORNINO,** | § | |
| **MELLISA BROWN, &** | § | |
| **CAMRON COCHRAN** | § | |
| *Plaintiffs,* | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. 6:24-cv-342** |
| | § | |
| **CITY OF KILLEEN,** | § | |
| **DEBBIE NASH-KING** | § | **Hon.** |
| *In her official capacity,* | § | |
| **KENT CAGLE** | § | |
| *In his official capacity,* | § | |
| **NINA COBB** | § | |
| *In her official capacity,* | § | |
| **KEN WILKERSON** | § | |
| *In his official capacity, &* | § | |
| **ALEX GEARHART** | § | |
| *In his official capacity,* | § | |
| *Defendants* | § | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

NOW COMES Plaintiffs, JAMES EVERARD, ANCA NEAGU, MICHAEL
FORNINO, MELLISA BROWN, and CAMRON COCHRAN, by and through their
attorney, CJ Grisham of Law Offices of CJ Grisham, P.L.L.C., complaining of
Defendants DEBBIE NASH-KING, KENT CAGLE, NINA COBB, and ALEX
GEARHART, in their official capacities, and respectfully allege as follows:

# I.
# JURISDICTION AND VENUE

1.  This is a civil rights action in which the Plaintiff seeks relief for the violations of his rights secured by 42 U.S.C. § 1983 and the First and Fourteenth Amendments under the United States Constitution, as well as rights secured under the Texas Constitution.

2. Jurisdiction of this Court is found upon 28 U.S.C. § 1331.

3. Venue is properly laid in the Western District of Texas under 28 U.S.C. § 1391(b)(2).

4. The events that gave rise to this lawsuit took place in Bell County, Texas.

5. Pursuant to 42 U.S.C. § 1983, and other applicable laws, the Court may award nominal, compensatory, and punitive damages, as well as equitable relief against all of the Defendants in their individual capacity, for the violations of Plaintiff's Constitutional rights and harm caused by their actions/inactions.

# II.
# PARTIES

6.  Plaintiff JAMES EVERARD ("Mr. Everard") is a law-abiding citizen of the United States and a resident of the City of Killeen, County of Bell, State of Texas.

7.  Plaintiff ANCA NEAGU ("MS. Neagu") is a law-abiding citizen of the United States and a resident of the City of Killeen ETJ, County of Bell, State of Texas.

8.  Plaintiff MICHAEL FORNINO ("Mr. Fornino") is a law-abiding citizen of the United States and a resident of the City of Killeen, County of Bell, State of Texas.

9.  Plaintiff MELLISA BROWN ("Ms. Brown") is a law-abiding citizen of the United States and a resident of the City of Killeen, County of Bell, State of Texas.

10.  Plaintiff CAMRON COCHRAN ("Dr. Cochran") is a law-abiding citizen of the United States and a resident of the City of Killeen, County of Bell, State of Texas.

11.  Defendant DEBBIE NASH-KING ("Defendant Nash-King") was at all pertinent times the elected mayor employed by the City of Killeen, and was at all pertinent times acting under color of state law in the performance of her duties as the Mayor presiding over open meetings of the City Council.

12.  Defendant NINA COBB ("Defendant Cobb") was at all pertinent times the elected mayor pro tem employed by the City of Killeen, and was at all pertinent times acting under color of state law in the performance of her duties as the Mayor Pro Tem presiding over open meetings of the City Council in the absence of the Mayor.

13.  Defendant KENT CAGLE ("Defendant Cagle") was at all pertinent times the city manager employed by the City of Killeen, and was at all pertinent times acting under color of state law in the performance of his duties as the City Manager.

14.  Defendant KEN WILKERSON ("Defendant Wilkerson") was at all pertinent times a Killeen City Council member acting under the color of state law in the performance of his duties as a City Councilman.

15.  Defendant ALEX GEARHART ("Defendant Gearhart") was at all pertinent times an Assistant Chief of Police employed by the Killeen Police Department and was at all pertinent times acting under color of state law in the performance of his duties as an

Assistant Chief of Police stationed at Killeen City Council Chambers at 101 N. College Street, Killeen, Texas 76541.

16.  Defendant CITY OF KILLEEN (the "city") is a home-rule municipality within the State of Texas, County of Bell with its headquarters at 101 N. College Street, Killeen, Texas 76541.

17.  Each and all of the acts of Defendants alleged herein were committed by said Defendants while acting within the scope of their employment with the City of Killeen.

18.  Each and all of the acts of Defendants were committed by these Defendants despite their knowledge that they were engaging in unlawful and unconstitutional acts, and yet they did them anyway, knowingly, recklessly, intentionally, wantonly, callously, purposely, purposefully, sadistically, cruelly, deliberately, and/or with deliberate indifference, gross negligence, and/or reckless disregard.

### III.

### INITIAL STATEMENT

*In a society under the forms of which the stronger faction can readily unite and oppress the weaker, anarchy may as truly be said to reign.*

19.  James Madison once wrote of the "great importance in a republic, not only to guard the society against the oppression of its rulers; but to guard one part of the society against the injustice of the other part."[1]  In *The Federalist Papers #51*, Madison went to great lengths to highlight the tyranny of the majority.  He understood that "[d]ifferent

---

[1] Hamilton, Alexander, et al. *The Federalist Papers*. Signet Classics, an Imprint of New American Library, A Division of Penguin Group (USA), 2005.

COMPLAINT AND DEMAND FOR JURY TRIAL – Everard v. Killeen

interests necessarily exist in different classes of citizens. If a majority be united by a common interest, the rights of the minority will be insecure."[2]

20.   The original text of the First Amendment to the United States Constitution, as drafted by Mr. Madison, read "The people shall not be deprived or abridged of their right to speak, to write, or to publish their sentiments."[3]  This was shortened by the special committee drafting the amendments for submission to the delegates, but highlights that the freedom of speech includes the protection from the abridgement of it.

21.   Yet, despite these admonitions against infringing upon the right to speak freely, President John Adams – who was present at these debates – passed the Sedition Act which criminalized anyone who would "write, print, utter or publish . . . any false, scandalous and malicious writing or writings against the government of the United States, or either house of the Congress of the United States, or the President of the United States, with intent to defame the said government, or either house of the said Congress, or the said President, or to bring them, or either of them, into contempt or disrepute."[4]  The act was used to suppress speech critical of the Adams administration.  While the Act was allowed to expire in 1800, the Supreme Court noted that it likely would have been ruled unconstitutional.[5]

---

[2] Id.
[3] Annals of Cong. 434 (1789). Madison had also proposed language limiting the power of the states in a number of respects, including a guarantee of freedom of the press. Id. at 435. Although passed by the House, the amendment was defeated by the Senate. See "Amendments to the Constitution, Bill of Rights and the States,"
[4] The Act, 1 Stat. 596 (1798).
[5] See *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ("Although the Sedition Act was never tested in this Court, the attack upon its validity has carried the day in the court of history."); See also *Watts v. United States,* 394 U.S. 705 (1969), Justice Douglas Concurring ("The Alien and Sedition Laws constituted one of our sorriest chapters; and I had thought we had done with them forever ... Suppression of speech as an effective police measure is an old, old device, outlawed by our Constitution.").

COMPLAINT AND DEMAND FOR JURY TRIAL – Everard v. Killeen

22.  Despite warnings from the past about the abridgement and destruction of speech against a free people, the current Killeen City Council is adamant about single-handedly destroying this right within its jurisdiction by attacking and suppressing its own citizens who do not willingly get in line with their tyranny or get in the boxcar.  Plaintiffs have appealed to Defendants' native justice and magnanimity time and again by attending city council meetings, seeking private meetings, and using other means of communication to seek redress, but "they too have been deaf to the voice of justice and consanguinity."[6]

23.  Defendants do not respect the First Amendment protected rights of its citizens unless those citizens bow to their invisible crowns and help inflate their power-hungry egos.  They have created a policy that forbids criticism of members of the City Council. When there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged. Plaintiffs are permitted to challenge the City Council Rules of Decorum not just because their own rights of free expression are violated, but because of a judicial prediction or assumption that the rule's very existence may cause others not before the court to refrain from constitutionally protected speech or expression based on the rule itself, feeling as if it would be useless to speak.[7]

24.  If you're a rich millionaire/billionaire, however, you get all kinds of time to speak to the council about why they should support your profiteering.  Citizens opposed

---

[6] *Declaration of Independence: A Transcription.  National Archives*, U.S. National Archives and Records Administration, October 11, 2023, www.archives.gov/founding-docs/declaration-transcript.
[7] See *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).

COMPLAINT AND DEMAND FOR JURY TRIAL – Everard v. Killeen

to these developers are only given four minutes each to respond to such people, which violates their 14th Amendment-protected rights to equal protection.

## IV.
## FACTUAL ALLEGATIONS

### A. Michael Fornino

25.  During the July 5, 2022, City Council Workshop on economic development, Mr. Fornino mentioned Defendant Wilkerson in his public comments.  Defendant Nash-King immediately cut him off saying, "sir, we do not call council members out."  Mr. Fornino was denied his right to criticize elected officials.  "Elected representatives are expected to shoulder a degree of criticism about their public service from their constituents and their peers—and to continue exercising their free speech rights when the criticism comes."[8]

26.  On October 18, 2022, Mr. Fornino spoke before the Killeen City Council to discuss "City Management Indirection."  During his comments, Mr. Fornino criticized the actions and expenditures of Killeen City Council members.  During his speech, Defendant Nash-King interrupted Mr. Fornino's speech when he told a city council member to look at him when he's talking.  Killeen City Council members have a tendency to ignore citizens during their comments, especially when those comments are critical of government officials.  They are more concerned with whatever they are doing on their phones than paying attention to citizens with legitimate (or even illegitimate)

---

[8] *Hous. Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253 (2022).

complaints.  Mr. Fornino has a clearly established right to seek redress of everyone in government and speak to whomever he chooses during his comments.

27.  On October 26, 2022, Mr. Fornino attended an outdoor event hosted by Killeen City Councilwoman Jessica Gonzalez (not a party to this suit).  At the event, Mr. Fornino accused City Councilman (and former Killeen Mayor) Jose Segarra of being responsible for the "food desert" in North Killeen.  In response to Mr. Fornino's accusations, Mr. Segarra (not a party to this suit) told Mr. Fornino that he was "full of shit" and to "go to the hospital and get your shit right. All that crap that you say, it is full of shit.  It's all full of shit, everything that comes out of your mouth."  While Mr. Segarra is not a party to this suit, it highlights the animosity that members of the City Council have against citizens who criticize them, even at public events.[9]

28.  On October 27, 2022, the City of Killeen City Council held what it termed a "town hall" meeting.  The town hall did not contain a single "agenda" item, yet it did include "items for discussion at Town Hall.  Item 3 contained "Hold Question and Answer Session Related to Items on the Agenda."  During the Town Hall, Defendant Nash-King presented a slide titled "Identity Statment[sic]."  On that slide was the phrase, "We respect our history, citizens, military, and institutional partners."  However, when Mr. Fornino attempted to talk about the disrespect shown to veterans, Defendant Nash-King interrupted his comments to tell him to stay on the agenda.  She did this not because he was off the agenda, but because he was being critical of the City Council.  Defendant

---

[9] The Killeen Daily Herald, the local newspaper, was present to document the interaction which can be found at https://kdhnews.com/news/local/segarra-fornino-explain-what-prompted-profanity-laced-argument-at-rally/article_b5c41fbc-5637-11ed-9e7d-67003ff3822c.html, as of February 3, 2024.

COMPLAINT AND DEMAND FOR JURY TRIAL – Everard v. Killeen

Nash-King violated Mr. Fornino's right to seek redress and free speech under the First Amendment. Defendant Nash-King thinks she has the power to regulate the content of speech of citizens if she doesn't approve of it, it isn't effulgent of her office and City Council, or it deflates her ego. After wasting his time with interruptions, Defendant Cagle informed Mr. Fornino that his "four minutes are up" and Mr. Fornino was required to cease speaking.

29. On November 1, 2022, the City Council held a Workshop. Mr. Fornino was on the agenda with a Citizen's Petition to discuss "Rule of Law Grievance." Prior to recognizing Mr. Fornino, Defendant Nash-King made a statement to the City Council that "residents do not attack council and residents do not attack staff." Defendant Nash-King was not referring to physical attacks, but some nebulous verbal "attack" that is undefined except in the always-offended mind of Defendant Nash-King. Her statement is *per se* evidence that it is the policy of the City of Killeen to restrict any speech that Defendant Nash-King or other self-appointed kings and queens of the City Council deem unworthy of listening to. Defendant Nash-King's new policy about "attacking" the city council or staff will play into all future violations of citizens' First Amendment-protected rights to seek redress and lay the foundation for prior restraint. In fact, as soon as Mr. Fornino begins speaking, Defendant Nash-King interrupts him to inform him that he is limited to four minutes.

30. During the December 6, 2022, City Council meeting, Mr. Fornino spoke during the Citizen's Comments period regarding agenda item OR-2-022, Consider an ordinance amending the Code of Ordinances Chapter 22, Article V – Marijuana

Enforcement.  During his comments on the agenda item, Mr. Fornino attempted to make an analogy to get his point across in opposition to the item.  Then-Mayor Pro Tem, Defendant Wilkerson, interrupted Mr. Fornino with a "point of order" stating that his comments were "a bit too much."  Defendant Nash-King then admonished Mr. Fornino not to "disrespect" the council during his comments, something is 100% protected by the First Amendment.  Regardless, "disrespect" is a subjective term at Killeen City Council and means "something I don't agree with."  Mr. Fornino was discussing an ordinance that would have violated Texas law and asked the Council how they would feel if someone petitioned City Council to "repeal the 13th-15th Amendments" to the United States Constitution.  Defendant Wilkerson did not like that analogy and neither did Defendant Nash-King who refused to let him continue with his train of thought on the matter.

31.  On March 28, 2023, Mr. Fornino spoke during Citizen Comments on Agenda Item DS-23-036, Discuss Wounded Hero Mental Health Program.  During his comments, Mr. Fornino discussed his opposition to the agenda item because there are federal programs that deal with mental health of wounded warriors.  Mr. Fornino then discussed how the city council is likely to ignore his opposition to the item the way that it ignores citizens that come up and talk about other issues.  Defendant Nash-King interrupted Mr. Fornino's line of reasoning and told him to "get back to the mental health…get back to what's on the agenda."  He was explaining how the council ignores them on other issues and will ignore him on this issue.  Defendant Nash-King thinks she has the power and authority to determine exactly how a member of the public will support or oppose an agenda item.  She does not allow them to explain the basis of their opinions if she single-

handedly thinks it is irrelevant.  She interrupts based on the content of the speaker's message.

32.   On April 4, 2023, Mr. Fornino was called during Citizen Comments to speak about Agenda Item DS-23-015, Discuss continuing or dissolving the Crime Solutions Committee.  During his comments, Mr. Fornino criticized the absence of council members on the Committee in pushing for its dissolution.  Defendant Nash-King, not liking Mr. Fornino's criticism of Mayor Pro Tem's conspicuous absence on an issue he was the chair of, hammered her gavel against Mr. Fornino and told him that his criticism of Defendant Wilkerson's leadership on the Crime Solutions Committee was "irrelevant." It was only irrelevant to Defendant Nash-King because she didn't agree with the criticism.  She explained, "if you want to talk about the agenda item, you can.  Anything about an individual is irrelevant."  Mr. Fornino explained that he is talking about the subject and Defendant Nash-King then decreed that he "can stick to the subject or take your seat," again proving that Defendants believe that they have the power to insert words into the speech of citizens and direct them to which opinions they may have. Defendant Nash-King took away Mr. Fornino's allocated time to speak his opinions about the agenda item.  At the end of Mr. Fornino's comments, several members of the audience began clapping at his speech.  Defendant Nash-King then admonished the public that "we do not clap."  Defendant Nash-King does not give similar admonishments when people clap about speech with which she agrees.  For example, at the very next meeting on April 18, 2023, a citizen gave a 4-minute presentation prior to Mr. Fornino

(see Paragraph 30) after which members of the public clapped.  But, because the issue was one with which Defendant Nash-King agreed, she did not admonish the public.

33.  On April 18, 2023, Mr. Fornino was called to speak during Citizen Comments.[10]  During his comments, Mr. Fornino was again critical of the City Council's continuous infringement of citizens' First Amendment-protected speech.  During his comments, Mr. Fornino mentioned the Prop A issue that is costing the city tens of thousands of dollars in legal fees because City Council was violating state law. Defendant Nash-King began laughing at Mr. Fornino as he began his comments.  Mr. Fornino then chastised her for laughing at such an important issue which then prompted Defendant Wilkerson to call for a "point of order."  He then addressed his "point of order" to Mr. Fornino who has no power to rule on points on order.  He then tells Mr. Fornino that he must stick to what is on the agenda.  Mr. Fornino explains that he is sticking to the agenda item, which is a broad topic.  Defendant Wilkerson then tells Mr. Fornino to "stop talking, guy." As Mr. Fornino explains that he is speaking on the agenda item, Defendant Wilkerson tells him, "hey guy, just calm down."  He then made clear that it was Killeen City policy not to allow citizens to "make personal statements about [city council members'] behavior."

34.  After Mr. Fornino ended his comments, Defendant Wilkerson left the dais and approached Mr. Fornino in the audience.  Defendant Nash-King attempted to get

---

[10] Prior to Mr. Fornino speaking during Citizen Comments, another member of the public approached to speak on Agenda Item DS-23-015, Discuss continuing or dissolving the Crime Solutions Committee.  During her comments about the police abuse of authority – something obviously within the confines of agenda item – Defendant Nash-King and the City Attorney continually interrupted her and told her she was "off-topic."  Defendant Nash-King thinks that only she will determine the type of speech citizens use to discuss agenda items.

COMPLAINT AND DEMAND FOR JURY TRIAL – Everard v. Killeen

Defendant Wilkerson back in his seat.  Despite Defendant Wilkerson interrupting the meeting and creating a scene, and despite Defendant Nash-King giving him several warnings, Defendant Wilkerson is not ejected from the meeting in accordance with their rules of decorum.  As Defendant Wilkerson approached Mr. Fornino, Mr. Fornino turned his back on Defendant Wilkerson and made clear that he had no desire to speak with Defendant Wilkerson.  Defendant Wilkerson continued to press towards Mr. Fornino in a threatening manner and with a "look of disdain" such that several individuals had to get between Defendant Wilkerson and Mr. Fornino. [11]  Defendant Gearhart was stationed in council chambers nearby and did nothing to de-escalate the tense situation.  Not content with simply shouting him down from the dais, Defendant Wilkerson was intent on a physically confrontation with Mr. Fornino based on Mr. Fornino's free speech criticism.[12]  After order was reinstated, Defendant Wilkerson made a statement on the record that when a citizen is "gonna go so low as to bring someone's personal life, their military career, under fire in public…that's not something that I can stand by as an individual and let go."  Once again, Defendant Wilkerson has stated for the record that citizens have no First Amendment right to criticize government officials as long as he is present without being subjected to censorship or even violence.

---

[11] Defendant Gearhart filed a report that stated that Defendant Wilkerson approached Mr. Fornino "clearly angry and confronted Fornino in the back of the Chamber" with a "look of disdain."   The report further stated, "The situation showed no signed of de-escalation. The mayor was standing next to Wilkerson, pleading with him to stop and return to his seat. Wilkerson did not respond to the mayor, instead continuing to engage with Fornino verbally."

[12] The Killeen Daily Herald covered the incident in a May 7, 2023 article titled "Officer statements give further insight to Wilkerson-Fornino confrontation": https://kdhnews.com/news/local/officer-statements-give-further-insight-to-wilkerson-fornino-confrontation/article_7877ca0a-ec5a-11ed-9239-9b6a1bf425ee.html

COMPLAINT AND DEMAND FOR JURY TRIAL – Everard v. Killeen

35.  After the April 18, 2023, incident, Defendant Cagle censored Mr. Fornino's Citizen Petition requests and refused to allow him to address City Council based on the content of his speech.  During the May 23, 2023, City Council meeting, Defendant Cobb read for the first time their "Rules of Decorum" clearly directed at Mr. Fornino and other Plaintiffs.  These "rules" included restrictions of speech against "expressing approval or disapproval" of speakers, a clear violation of First Amendment-protected, expressive speech.  The rule was not limited in any way to speech that was distracting or interfering with the meeting and included ALL protected forms of speech.  The rules also required that any speech be presented with "civility," which the Defendants clearly interpret as "not critical of our holy and untouchable tyrannical rule over the little people."

36.  During the August 15, 2023, City Council Workshop, Defendant Nash-King again interrupted Mr. Fornino while speaking on agenda item PH-23-045, "HOLD a public hearing and consider an ordinance amending the FY 2023 Annual Budget of the City of Killeen to increase revenue and expense accounts in multiple funds."  Mr. Fornino explained all the ways that he feels the city has been wasting funds and now wants to increase the budget.  When he attempted to bring up one such example, Defendant Nash-King interrupted him and told him he was off topic, running out the remainder of his time.

37.  The next week, during the August 22, 2023, City Council meeting, Mr. Fornino spoke during Citizen Comments on several agenda items.  During the speech, he mentioned City Councilman Alvarez to correct something he had said during the

comments of another citizen and was interrupted by Defendant Nash-King because he was criticizing a member of the council.

38.   Again, on September 12, 2023, Defendant Nash-King interrupted Mr. Fornino during his comments related to the city budget because Defendant Nash-King wanted to dictate how he crafted his speech in opposition to the budget.  Mr. Fornino was complaining about the City Manager's salary – a part of the budget – when Defendant Nash-King interrupted him several times telling him he was "off topic."  Defendant Nash-King was not content with merely silencing Mr. Fornino's opinions and criticism, she threatened to have him arrested if he didn't shut his mouth and limit his speech to that which Defendant Nash-King felt was flattering enough to her tyrannical rule and desired outcomes.

39.   During a public hearing on Agenda Item PH-23-052 to "consider an ordinance amending the FY 2023 Annual Budget of the City of Killeen to adjust revenue and expenditure accounts in multiple funds," Defendant Nash-King, as if on queue recognizing that Mr. Fornino was about to make a great point about her lack of civil awareness and stewardship of public funds, interrupted Mr. Fornino during his comments because she didn't want to hear his analogies about why he's opposed to the budget request.  Defendant Nash-King told Mr. Fornino that "a history lesson is not on the agenda," despite his response that he attempting to explain the intent behind the lawsuit, but Defendant Nash-King wanted to hear none of it because it exposed who is funding the efforts that led to the lawsuit in the first place.  Defendant Nash-King told him "this is not a history lesson, please just talk about the marijuana."  Defendants do not get to

15

dictate how individuals discuss their opposition to an agenda item.  When he continued to explain how he was on the agenda, Defendant Nash-King told him "this is your final warning and you're gone."

40.  This complaint would go on another 20 pages if I listed every time that Defendants interrupted and violated Mr. Fornino's free speech, but it is sufficient to say that as of the filing of this complaint, Defendant Nash-King continues to dictate and interfere with the free speech of citizens attempting to discuss agenda items in a way she doesn't approve of.

## B. Anca Neagu

41.  Ms. Neagu is another frequent critic of the City Council who Defendants Nash-King and Cagle frequently silence.

42.  On November 14, 2023, Ms. Neagu signed up to speak before the City Council during Citizen Comments.  Defendant Nash-King interrupted her several times to prevent her from voicing her opinions on matters of public interest.

43.  On November 28, 2023, Defendant Nash-King interrupted Ms. Neagu during her speech to inquire as to who her represents her on the City Council.  The purpose of this question was to nullify Ms. Neagu's criticism of the City Manager because Ms. Neagu does not live within the city limits, but resides in the ETJ.

44.  On December 12, 2023, Defendant Cagle removed Ms. Neagu's signup form to speak during citizen comments based on an email from Defendant Nash-King.  Ms. Neagu signed up in a timely fashion just as other speakers did, but was denied equal protection under the law because of the content of her speech.

45.  On December 19, 2023, Defendant Cagle again denied Ms. Neagu her right to speak during Citizen Comments.  Ms. Neagu signed up in a timely fashion just as other speakers did, but was denied equal protection under the law because of the content of her speech.

46.  On January 9, 2024, Defendants Cagle and Nash-King again denied Ms. Neagu her right to speak during Citizen Comments.  Ms. Neagu signed up in a timely fashion just as other speakers did, but was denied equal protection under the law because of the content of her speech.

### C.  Camron Cochran

47.  Dr. Cochran is another frequent critic of the City Council who Defendants Nash-King and Cagle frequently silence.

48.  On January 9, 2024, Dr. Cochran attended the City Council Meeting to speak on removing non-agenda citizen comments.   When Defendant Nash-King introduced Dr. Cochran as "Mr. Cochran," he corrected her that his title was Dr. Cochran.  Defendant Nash-King gaveled a five-minute break in frustration because of the correction.  During Dr. Cochran's comments, he was repetitively interrupted during his allocated Citizen Comments by Defendant Nash-King and Concilmember Boyd for being "off-topic" despite his comments being related.  However, Defendant Nash-King thinks she has the power to dictate what and how people speak during their citizen comments.

49. After Dr. Cochran's speech, former Council Member Wilkerson spoke in a favorable and complimentary manner about the City Council.  Some members of the

audience erupted into applause, but Defendant Nash-King did not gavel anyone out or threaten to arrest them for the outburst.

50.  On January 16, 2024, Dr. Cochran signed up to speak on an agenda item during Citizen Comments.  Defendant Nash-King frequently interrupted Dr. Cochran's speech because she didn't like the way that he was addressing the agenda item.  The constant interruptions by Defendant Nash-King demanding that Dr. Cochran "stay on agenda" ate into his allotted time and was not compensated.  Defendant Nash-King then accused Dr. Cochran of "disrupting the meeting" despite it being his allotted time to speak as he chose.

### D. Mellisa Brown

51.  On April, 2024, Ms. Brown addressed the council on Agenda Item 20: PH-24-011 "HOLD a public hearing and consider an ordinance requested by TCG Engineering on behalf of GWC Holdings, LLC and McLean Commercial Ltd. (Case #Z24-04) to rezone approximately 195.04 acres out of the W. H. Cole Survey, Abstract No. 200, from "A" (Agricultural District) to "R-1" (Single-Family Residential District). The subject property is generally located on the west side of Featherline Drive, west of the intersection of Malmaison Road, Killeen, Texas."

52.  Prior to Ms. Brown speaking, another citizen addressed the council on the same agenda item.  He was not a regular attendee who is critical of Defendants, but was opposed to the rezoning in question.  When his three minutes expired to speak on the

item, the citizen asked the council for another minute to complete his thoughts.  The council voted to approve an additional minute for this citizen.[13]

53.  Ms. Brown, a frequent critic of the Mayor and members of the Council, spoke on the same item and exhausted her three minutes.  Immediately upon the expiration of her Ms. Brown's three minutes, Defendant Nash-King cut her off and read the name of the next person signed up to speak.  Ms. Brown asked for an additional minute to speak and conclude her remarks.  Defendant Nash-King told her, "your time is up."  Ms. Brown asked for an additional minute and the Council voted **not** to allow Ms. Brown an additional minute, a violation of her right to equal protection under the law.  She also denied Ms. Brown additional time on October 17, 2023, January 30, March 19 and April 4, 2024, showing a pattern of discriminatory behavior against Ms. Brown.

54. On April 23, 2024, Ms. Brown again attended the City Council meeting as she usually does.  Defendant Boyd, during his privileged comments, stopped what we was saying and called a "point of order" on "a sign in the back."  "I'm not sure if it's a distraction or not," he said.  The "sign" was nothing more than "Vote Them Out" written on the back of a clipboard in pen and ink that was being held by Mr. Cochran.

55.  Defendant Nash-King banged her gavel and then stated, "Mr. Cochran and Mellisa Brown, you are disrupting the meeting.  Please take down that sign."  The meeting was going along just fine until Defendant Boyd decided to make an issue about

---

[13] See the 01:34:30 mark of the city's live feed at https://www.youtube.com/watch?v=JoRxDovdPBA

COMPLAINT AND DEMAND FOR JURY TRIAL – Everard v. Killeen

an 8.5" x 11" sheet of paper on a clipboard.  Ms. Brown had nothing to do with the "sign" but was individually called out by her full name.

56.  During the March 5, 2024, City Council Workshop, Ms. Brown brought attention to the fact that Defendant Nash-King went off-agenda several times.  Defendant Nash-King then interrupted her, gaveled her out of order, and demanded that she – Ms. Brown – stay on-agenda.  In the meantime, city vendors were give extra time to plead their cases while citizens were cut off in opposition.

57.  On December 12, 2023, during the City Council Meeting, Ms. Brown involuntarily chuckled at something said in the back in the back of the chambers and immediately apologized.  No one in the video even noticed, but Defendant Nash-King used it as an opportunity to give her "your first warning."  When Ms. Brown again apologized to the mayor, Defendant Nash-King had her removed under threat of arrest from the meeting.  The video clearly shows that the involuntary chuckle was not noticed by anyone either in the audience or on the dais because no one turned around or even acknowledged it.  However, Defendant Nash-King is hyper-aware of Ms. Brown's every movement and utterance because Ms. Brown has the audacity to run against her during election season and is a frequent critic of her alleged leadership.

58.  During the May 23, 2023, City Council meeting, Defendant Cobb read for the first time their "Rules of Decorum" clearly directed at Ms. Brown and other Plaintiffs because anyone praising the City Council is giving wide berth.  These "rules" included restrictions of speech against "expressing approval or disapproval" of speakers, a clear violation of First Amendment-protected, expressive speech.  The rule was not limited in

any way to speech that was distracting or interfering with the meeting and included ALL protected forms of speech.  The rules also required that any speech be presented with "civility," which the Defendants clearly interpret as "not critical of our holy and untouchable tyrannical rule over the little people."

59.  The City of Killeen's Governing Standards and Expectations document states that "persons in attendance [of City Council meetings] shall not carry signs or placards."[14]  The document does not define what constitutes a "sign" or "placard."  The section is unconstitutionally overbroad because it does not define sign and there is no compelling governmental interest in the wholesale ban of signs or placards that are not disruptive.  Additionally, an 8.5" x 11" piece of paper held silently in the back of the room is no more disruptive than someone wearing a t-shirt seated in the first row that says "Vote Them Out."  Ms. Brown and Mr. Cochran were singled out solely based on who they are, not what they held.  Defendants Boyd and Nash-King are constantly looking for reasons to harass, annoy, embarrass, or otherwise eject plaintiffs based on their speech.

60.  The suppression of free speech by the government during open meetings is limited by both the Texas Open Meetings Act (TOMA) and constitutional protections under the First Amendment.  The primary limitation is that any regulation of speech must be content-neutral, not suppress speech based on the speaker's viewpoint, and only involve reasonable time, place, and manner restrictions that are narrowly tailored to serve

---

[14] City of Killeen, *City of Killeen Governing Standards and Expectations*, Sec. 1-80(d)(5) – No Disruptions, amended by Res. 23-102R, dated June 27, 2023

COMPLAINT AND DEMAND FOR JURY TRIAL – Everard v. Killeen

a significant governmental interest without unnecessarily restricting free speech.  The Texas Constitution and related case law provide robust protections for free speech, emphasizing the importance of uninhibited, robust, and wide-open debate on public issues.  Texas courts have consistently upheld a strong preference for freedom of expression, particularly in the context of government affairs.  *See e.g. Brammer v. KB Home Lone Star, L.P.*, 114 S.W.3d 101 (Tex. App.—Austin 2003, no pet.); *Ross v. Labatt*, 894 S.W.2d 393 (Tex. App.—San Antonio 1994, writ dism'd w.o.j.); *Cain v. Hearst Corp.*, 878 S.W.2d 577 (Tex. 1994).  This constitutional backdrop reinforces the limited scope within which the government may regulate speech during open meetings.

### E. James Everard

61.  Mr. Everard was a candidate for Killeen Mayor in 2022.  He is also an active community member and, like the other Plaintiffs, advocates for citizens' rights.

62.  After Mr. Everard lost the election to Defendant Nash-King, he was blocked from commenting on the City's public Facebook page.  The public has a right to view and participate on the social media pages of their government officials when those officials create interactive webpages for that purpose.[15]   The City blocked Mr. Everard from participating in that public forum, specifically its public Facebook Page, because it disapproves of his public criticisms or political stance.

63.  The City of Killeen has a Facebook page of the same name which can be accessed at https://www.facebook.com/KilleenTexas by anyone, including those who do

---

[15] See *Knight First Amend. Inst. At Colum. Univ. v. Trump*, 302 F. Supp. 3d 541, 573 (S.D.N.Y. 2018).

not have a Facebook account of their own.  The City encourages and permits the public to (1) comment, like, and share its posts on community matters, advisories, press releases, activities, and other issues, and (2) to reply to and like comments posted to the page by members of the public.

64.  The City willingly and knowingly created and configured the Facebook page to be open to the public and allow page visitors to interact openly with the page, its content, and fellow page visitors through commenting, likes, and shares.  The City is fully aware of Facebook's high compatibility with and use for openly expressive activity when creating and making public the City's Facebook Page.  Likewise, it knowingly and willingly created the Facebook Page to encourage and permit public expression and interaction on matters of public concern.

65.  At no time has Mr. Everard been defamatory, obscene, inciteful of imminent unlawful activity, or even profane, indecent, insulting, harassing, offensive, or threatening.  Mr. Everard has an opinion that is oppositional to the opinion of Defendants.  This is clearly content based discrimination and will not be tolerated.  It is clearly established that a government official cannot censor or restrict speech, or punish a speaker, based on the viewpoint or criticism expressed, regardless of the type of forum.[16]

66.  At the same time, the City has violated the right of the thousands of people who follow its Facebook page to receive information that could have been provided by Mr. Everard regarding matters of public concern.[17]  By blocking Mr. Everard from its

---

[16] See *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829-30 (1995); *R.A.V. v. St. Paul*, 505 U.S. 377, 391-92 (1992).
[17] *Kleindienst v. Mandel*, 408 U.S. 753, 762-63 (1972).

COMPLAINT AND DEMAND FOR JURY TRIAL – Everard v. Killeen

social media page, the City has violated his right to expressive association by electronically separating him from the thousands of people who follow the page.[18]

67. As a direct and proximate cause of the Defendants' actions, Mr. Everard has been prevented from communicating with constituents about matters of public concern, restricting his ability to participate in peaceful online assembly and petition for the redress of grievances.

**COUNT I**
**VIOLATION OF CIVIL RIGHTS UNDER 42. U.S.C. 1983**
**(Violation of First Amendment Rights)**

68. Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

69. Under color of state law, Defendants have deprived and continue to deprive Plaintiffs of their rights to freedom of expression, including through expressive conduct, and to freely petition for redress of grievances under the First Amendment.

70. "When public officials are given the power to deny use of a forum in advance of actual expression or association, the danger of prior restraints exists." *Collins v. Ainsworth*, 382 F.3d 529, 539 (5th Cir. 2004). "[A] system of prior restraint avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system." Id. (quoting *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975)). "It is thus clearly established that if public officials abuse their discretionary power to deny in advance use of a forum for First

---

[18] *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000).

Amendment—protected expression without enacting proper safeguards, this constitutes

an impermissible prior restraint." *Id*.

71.  As a direct and proximate result of Defendant's unlawful actions, Plaintiff

was harmed and suffered damages as a result.

**COUNT II**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983**
**(Fourteenth Amendment – Violation of Procedural Due Process Rights)**

72.  Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth

above and incorporates them as if fully set forth herein.

73. "To establish a violation of the Fourteenth Amendment's guarantee of

procedural due process, a plaintiff must prove that (1) he was deprived of a life, liberty,

or property interest (2) without the process that was due." *Saucedo-Falls v. Kunkle*, 299

F. App'x 315, 319 (5th Cir. 2008) (per curiam) (citing *Cleveland Bd. of Educ. v.

Loudermill*, 470 U.S. 532, 538 (1985)). "At a minimum, due process requires that notice

and an opportunity to be heard 'be granted at a meaningful time and in a meaningful

manner.'" *Ellis v. Texas Dept. of Ins.—Div. of Workers' Compensation*, 700 F.3d 227,

239 (5th Cir. 2012) (quoting *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972)); *see also Systems

Contractors Corp. v. Orleans Parish School Bd.*, 148 F.3d 571, 575 (5th Cir. 1998) ("At

a minimum, notice and a hearing are required before an individual may be deprived of his

property or liberty interests.") (citing *Mathews v. Eldridge*, 424 U.S. 319 (1976)). "[T]he

specific process due in a particular situation is found by balancing three factors: (1) the

private interest that will be affected by the official's actions, (2) the risk of an erroneous

deprivation of that private interest and the probable value, if any, that additional

procedural protections would provide, and (3) the interest that the government seeks to achieve." *Systems Contractors Corp.*, 148 F.3d at 575.

74.   Courts have held that individuals have a liberty interest in being in a public place of their choice. *See City of Chicago v. Morales*, 527 U.S. 41 (1999) (plurality opinion) ("[I]t is apparent that an individual's decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers that is a part of our heritage" (citations and internal quotation marks omitted)); *Kennedy v. City of Cincinnati*, 595 F.3d 327, 336 (6th Cir. 2010) (holding that the plaintiff had a liberty interest "to remain in a public place of his choice"); *Catron v. City of St. Petersburg*, 658 F.3d 1260, 1266 (11th Cir. 2011) (holding that the plaintiffs "have a constitutionally protected liberty interest to be in parks or on other city lands of their choosing that are open to the public generally").

75.   Accordingly, Plaintiffs have an interest in being at City Council Meetings and exercising their First Amendment rights.

76.   Plaintiffs were denied a meaningful opportunity to be heard before being cut off, silenced, removed, and otherwise violated that was afforded to others with supportive views of the Defendants.

77.   As a direct and proximate result of Defendant's unlawful actions, Plaintiff was harmed and suffered damages as a result.

### COUNT IV
### VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (Declaratory Relief)

78.  Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

79.  Defendants deprived Plaintiffs of their federal constitutional rights to freedom of speech, to peaceably assemble, and to petition government for redress of grievances, causing irreparable harm to Plaintiffs.

80.  Plaintiffs are therefore entitled to a declaration pursuant to 28 U.S.C. § 2201 that their rights arising under the Constitution have been violated by the actions of the Defendants and that the Rules of Decorum and the Standards and Governing Principles are facially unconstitutional and as applied to the activities of Plaintiffs.

## <u>COUNT VI</u>
## <u>VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983</u>
## <u>(First Amendment - Retaliation)</u>

81.  Plaintiffs restate and incorporate by reference each and every allegation set forth in all prior paragraphs.

82.  At all times relevant herein, Defendants were acting under the color of State law.

83.  Defendants knew or should have known that Plaintiffs have a right to free and expressive speech on matters of public concern without interference by government officials.

84.  In retaliation for this protected conduct, Defendants threatened Plaintiffs with arrest or leave a place they had a right to be, silenced them, mocked and chastised them publicly, and made it impossible to take part in government proceedings without censorship.

85.  It is clearly established that it is a First Amendment violation if a government official retaliates against someone in response to protected speech. *Mesa v. Prejean*, 543 F.3d 264, 273 (5th Cir. 2008) (citing *Lewis v. City of New Orleans*, 415 U.S. 130, 134-35, (1974) (Powell, J., concurring)) ("Trained officers must exercise restraint when confronted with a citizen's anger over police action."); *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002) ("The First Amendment prohibits . . . adverse governmental action against an individual in retaliation for the exercise of protected speech activities."); *see Hill.*, 482 U.S. at 462 ("[The] First Amendment protects a significant amount of verbal criticism and challenge directed at police officers.").  Defendants violated this right.

86.  Defendant's conduct was made for one purpose: in retaliation to Plaintiffs exercising their First Amendment rights.

87.  Defendants' conduct deprived Plaintiffs of the rights, privileges, and immunities guaranteed to citizens of the United States by the First and Fourteenth Amendments to the Constitution of the United States, and in violation of 42 U.S.C. § 1983.

88.  The elements of a free speech retaliation claim under the Texas Constitution do not require proof of an official policy or custom. *See Caleb v. Carranza*, 518 S.W.3d 537, 544 (Tex. App.—Houston [1st Dist.] 2017, no pet.).  However, Plaintiffs have properly alleged proof of an official policy or custom by quoting from Defendants own Rules of Decorum and Governing Standards and Principles manuals.

89.  As a direct and proximate result of Defendant's unlawful actions, Plaintiff was harmed and suffered damages as a result.

## DAMAGES

90. **Declaratory and Injunctive Relief.**

91. **Actual damages.** Defendants' acts or omissions were a proximate cause and the moving force behind the following actual damages suffered by the Plaintiff, and Defendants should be held jointly and severally liable for the mental anguish, emotional distress, and loss of rights and liberty.

92. **Punitive/Exemplary Damages against individual defendants.** Punitive/exemplary damages are recoverable under Section 1983 when the conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others. Here, the conduct of Defendants were done with evil motive or intent, or at the very least, was reckless or callously indifferent to the federally protected rights of Plaintiffs. As such, Plaintiffs request punitive and exemplary damages to deter this type of conduct in the future in the amount of **one million dollars**.

93. Prejudgment and post judgment interest.

94. Costs of court.

95. Reasonable and necessary attorney's fees incurred by the Plaintiffs through trial, and reasonable and necessary attorney's fees that may be incurred by Plaintiff for any post-trial proceedings, or appeal, interlocutory or otherwise, pursuant to 42 U.S.C. § 1988, and as otherwise permitted by law.

96. Plaintiff seeks unliquidated damages in an amount that is within the jurisdictional limits of the Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that Defendants be cited to appear and answer herein; that upon final trial hereof the Court grants Plaintiffs declaratory relief; actual damages, exemplary damages, pre-judgment interest at the legal rate; interest on said judgment at the legal rate; attorney fees; costs of court; and such other and further relief, both general and special, at law and in equity, to which Plaintiffs are justly entitled.

## **JURY DEMAND**

Plaintiffs hereby demands a trial by jury of all issues so triable, pursuant to Fed. R. Civ. P. 38(b).

Respectfully Submitted,

LAW OFFICES OF CJ GRISHAM PLLC

**CJ GRISHAM**
Texas State Bar No. 24124533
cj@cjgrisham.com
3809 S. General Bruce Dr.
Ste 103-101
Temple, Texas 76502
Telephone: 254-405-1726
**COUNSEL FOR PLAINTIFFS**

COMPLAINT AND DEMAND FOR JURY TRIAL – Everard v. Killeen