UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| JAMES EVERARD, *et al.* § | | |
|     *Plaintiffs*, § | | |
| § | | |
| vs. § | CIVIL ACTION NO. 6:24-cv-342 | |
| § | | |
| CITY OF KILLEEN, *et al.* § | | |
|     *Defendants* § | | |

## PLAINTIFF'S SUR-REPLY TO DEFENDANTS' REPLY
## IN SUPPORT OF RULE 12(b)(6) MOTION TO DISMISS

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Plaintiffs, JAMES EVERARD, ANCA NEAGU, MICHAEL FORNINO, MELLISA BROWN, and CAMRON COCHRAN, by and through their attorney, CJ Grisham of Law Offices of CJ Grisham, P.L.L.C., complaining of Defendants DEBBIE NASH-KING, KENT CAGLE, NINA COBB, and ALEX GEARHART, in their official capacities, and respectfully submits this Sur-Reply to Defendants' Motion under Rule 12(b)(6) to dismiss, and in support would show the following:

### I.
### INITIAL STATEMENT

*"To argue with a person who has renounced the use of reason is like administering medicine to the dead."*

Thomas Paine

# II.
# MEAT OF THE SUR-REPLY TO DEFENDANTS' REPLY
# IN SUPPORT OF RULE 12(b)(6) MOTION TO DISMISS

There was once a man who took his wife to her favorite restaurant for a special anniversary dinner. As always, he ordered the spaghetti with meatballs because they were the best in town. However, as he raised the first meatball to his mouth, he detected a rancid odor. The man called over the waiter and told him that he thinks the meatballs are bad. The waiter raised the meatball to his nose and immediately recognized that something wasn't right. The waiter apologized to the man, told the man he would take the meatball to the kitchen, and told the man to enjoy the rest of his meal. What is the man to do? Does he trust that the rest of the meal is just fine, or does he refuse to eat any of the spaghetti in case it is all rancid?

Defendants want this Court to ignore the rancid meatballs in their argument. They immediately note – wrongly – that the Plaintiffs have not cited any case law dealing with city councils in their response except for case law "from other contexts." Meanwhile, the Defendants themselves do exactly what they accuse Plaintiffs of doing in sharing cases that have no bearing on Texas or even 5th Circuit law. The fact is that the cases Defendants use in their reply to justify violating Plaintiffs' rights aren't constrained by the same limitations the Texas legislature has placed on government entities through the Open Meetings Act.

Plaintiffs agree that this issue has not necessarily been litigated to the point of creating case law, but they are more than excited to created it to protect the rights of

future plaintiffs and put government entities on notice about the limits to their authority. That said, there is plenty of additional case law that Plaintiffs will further provide to make it more obvious than previously indicated that Defendants have violated, and continue to violate, the First Amendment Protected rights of Plaintiffs.

Accordingly, Defendants' motion to dismiss should be denied and the parties ordered to begin discovery.

## III.
## AUTHORITIES AND ANALYSIS

### A. PUBLIC MEETINGS MUST PROTECT FREE SPEECH OF THE PUBLIC

"The right to criticize public officials is at the heart of the First Amendment's right of free speech." *Kaluczky v. City of White Plains*, 57 F.3d 202, 210 (2d Cir. 1995) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 282, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)). Furthermore, "[c]itizens are encouraged to speak out on matters of public concern and are constitutionally protected when they exercise that right." *Id.* (citing *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)). The Supreme Court has recognized the "right to petition as one of the most precious of the liberties safeguarded by the Bill of Rights." *BE&K Constr. Co. v. NLRB*, 536 U. S. 516, 524, 122 S. Ct. 2390, 153 L. Ed. 2d 499 (2002) (internal quotation marks omitted).

In general, there are only limited classes of speech which do not fall within the ambit of First Amendment protection, such as "the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words," none of which clearly apply here. See

*Williams v. Town of Greenburgh*, 535 F.3d 71, 77 (2d Cir. 2008) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72, 62 S. Ct. 766, 86 L. Ed. 1031 (1942)). Plaintiffs' speech included in the Amended Complaint are protected under this standard.

The government's power to prevent or limit speech on public property is carefully circumscribed by the First Amendment. Not all public property is open to unfettered public speech, for the "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *United States Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129, 69 L. Ed. 2d 517, 101 S. Ct. 2676 (1981). Government facilities that are not committed to public communicative activity may regulate speech by the general public so long as that regulation is reasonable and not based on opposition to a particular viewpoint. *Id*. at 131 n.7. That is because the government "may legally preserve the property under its control for the use to which it is dedicated." *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 390, 124 L. Ed. 2d 352, 113 S. Ct. 2141 (1993).

On the other hand, public areas that are open to general "assembly and debate" as a matter of tradition or by specific government designation, such as public meetings in Texas, are characterized as a public forum, within which speech can be limited only narrowly. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677, 140 L. Ed. 2d 875, 118 S. Ct. 1633 (1998), quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 74 L. Ed. 2d 794, 103 S. Ct. 948 (1983)); see also *Whiteland Woods, L.P. v. Township of West Whiteland*, 193 F.3d 177, 182 n.2 (3d Cir. 1999). Streets and parks are examples of traditional public forums. See, e.g., Hague v. CIO, 307 U.S. 496,

4
12(b)(6) Sur-Reply to Defendants' Response – Everard v. Killeen

515, 83 L. Ed. 1423, 59 S. Ct. 954 (1939). Public forums are also established when the government opens property for general "expressive activity," *Perry Educ. Ass'n*, 460 U.S. at 45. Absent a compelling interest, speech in a public forum may not be regulated based upon content. Furthermore, in a public forum any restrictions as to time, place, and manner of speech (1) must be unrelated to content; (2) must be "'narrowly tailored to serve a significant governmental interest'"; and (3) must allow alternative ways of communicating the same information. *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 105 L. Ed. 2d 661, 109 S. Ct. 2746 (1989).

There is a third type of public setting that the courts have recognized -- a forum created by the government that is limited to certain groups or to discussion of certain topics. See *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829, 132 L. Ed. 2d 700, 115 S. Ct. 2510 (1995); *Lamb's Chapel*, 508 U.S. at 392-93. An example of this kind of limited public forum is a university facility open for meetings of student groups, but not for the general public. See, e.g., *Widmar v. Vincent*, 454 U.S. 263, 268, 70 L. Ed. 2d 440, 102 S. Ct. 269 (1981). The Supreme Court has not precisely instructed where the limited public forum is located on the First Amendment spectrum between the strict test for public forum regulation and the more relaxed test for nonpublic regulation. See *Whiteland Woods*, 193 F.3d at 182 n.2. Earlier decisions, such as *Widmar* itself, 454 U.S. at 269-70, and *Perry Educ. Ass'n*, 460 U.S. at 45-46 & n.7, suggest that content-based restraints on limited public forums must be subject to strict scrutiny, and can survive only if they are supported by a compelling interest.

Recently, however, the Court has apparently moved to the position that regulation of a limited forum may survive under a test that is less strict than that applied in the case of a general open forum. *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106, 150 L. Ed. 2d 151, 121 S. Ct. 2093 (2001). Under this refined test for reviewing limited forum restrictions, content-based restraints are permitted, so long as they are designed to confine the "forum to the limited and legitimate purposes for which it was created." *Rosenberger*, 515 U.S. at 829; see also *Brody v. Spang*, 957 F.2d 1108, 1118 (3d Cir. 1992). Two limitations remain. Any restrictions on speech must be viewpoint neutral and must be "'reasonable in light of the purpose served by the forum.'" *Good News Club*, 533 U.S. at 106-07 (quoting *Cornelius v. NAACP Legal Def. & Ed. Fund, Inc.*, 473 U.S. 788, 806, 87 L. Ed. 2d 567, 105 S. Ct. 3439 (1985)).

Put simply, under contemporary public forum jurisprudence, a designated (as opposed to traditional) forum is reviewed under a sliding standard that allows for content-related regulation **so long as** the content is tied to the limitations that frame the scope of the designation, and **so long as the regulation is neutral as to viewpoint** within the subject matter of that content.

In this case, the primary restrictions placed on Plaintiffs' speech occurred during their appearance at the public comments portion of the Killeen City Council meetings, during which several Plaintiffs were eventually removed. Whether the public forum was a general public forum or a limited public forum is a close question. Certainly, the public forum is not limited to a particular class of speakers, as was the case in *Cornelius* (charities), *Rosenberger* (student groups), or *Forbes* (political candidates). Indeed, the

public forum -- as its name suggests -- is open to all members of the public who wish to address the City of Killeen government.  At the same time, a review of the transcript of the forum confirms that even the public discussion session of the City meeting was designed to be limited to matters pertaining to City of Killeen governance.  The meeting was not the equivalent of a municipal theater, as in Southeastern Promotions, or a public park or street. One would certainly not expect the forum of a City meeting to include such expressive activities as performance art, lectures on medieval history, or arguments about private disputes involving town citizens.  "Plainly, public bodies may confine their meetings to specified subject matter . . . ." *City of Madison Joint Sch. Dist. v. Wis. Employment Relations Comm'n*, 429 U.S. 167, 175 n.8, 50 L. Ed. 2d 376, 97 S. Ct. 421 (1976); see White v. City of Norwalk, 900 F.2d 1421, 1425 (9th Cir. 1990).  Thus, matters presented at a public forum may be limited to issues germane to City government, but may NOT censor the manner in which members of the public discuss that specified subject matter, as is the case here.

Defendants make it a habit to censor speech that is critical, especially when it relates to the Plaintiffs in this case.  By way of example, as Defendants were filing their reply in response of Rule 12(b)(6) motion to dismiss, they were simultaneously engaging in more content-based, discriminatory censorship of Plaintiffs.

   I.    **Unequal and Discriminatory Enforcement of Rules of Decorum**

During the September 17, 2024, City Council meeting, during Plaintiff Cochran's recognized 4 minutes, he began speaking from a seated position due to his medical condition.  Councilman Boyd made a point of order requiring Plaintiff Cochran to stand

at the podium to which Plaintiff Cochran explained that he has a medical condition that requires ADA accommodations. He was gaveled out of the meeting for speaking out of turn during his four minutes which was interrupted by Councilman Boyd's "point of order" on an issue that neither the rules of decorum or ordinance dictates.

However, ejecting Plaintiff Cochran was not the most egregious incident. As Defendant Nash-King ejected Plaintiff Cochran from the meeting, many supportive members in attendance clapped and hollered from the gallery in approval of the mayor's decision.[1] Not a single individual clapping or making comments in support of Defendant Nash-King was rebuked, corrected, gaveled out of order, or required to leave. As Plaintiff Cochran was being removed by law enforcement officers under threat of force, supportive members of the public began clapping again. Defendant Nash-King responded to the second round of clapping with "please do not clap." No one was give a warning about the violation of decorum rules.

However, when another critic of Defendants asked why they weren't asked to leave, Defendant Nash-King instead gave HIM his "first warning" that he would be ejected. Not a single individual supportive of Defendants who made outbursts during this meeting (or really any meeting) was given a warning and threatened with police violence if they did not leave.

While Plaintiff Fornino was addressing Defendants during public comments, he was interrupted by Defendant Nash-King while discussing Item 7 on the agenda.

---

[1] See City of Killeen City Council Meeting Video, Tuesday, September 17, 2024, at the 02:06:24 mark, https://killeen.granicus.com/player/clip/777?view_id=2&redirect=true.

Plaintiff Fornino was blaming Defendant Nash-King for why the city had been hacked for putting account information in the attachments. She interrupted him to say "stay on the agenda" and to say "please continue" while he spoke on the agenda item. After Plaintiff Fornino finished his comments, Councilman Boyd began speaking and someone from the audience audibly laughed but was not gaveled out or given a specific warning.[2] Those are reserved for the Defendants' critics.

    As further evidence of ongoing acts by Defendants to treat Plaintiffs differently than the Defendants' supporters, not a single Defendant offered a "point of order" or gaveled a supportive speaker who began criticizing Plaintiff Brown from the podium. The evidence in this case will show that when one of the Plaintiffs make a comment about someone in the audience, he or she is either interrupted with a point of order by Councilman Boyd or a gavel by Defendant Nash-King. The speaker was able to say without resistance that Plaintiff Brown "has a negative influence" in the community. The supportive speaker went through a laundry list of negativity about Defendant Brown without so much as a peep from Defendants. And when Defendant Brown attempted to enforce the rules of decorum by telling the mayor that the speaker was out of line, Defendant Nash-King instead gaveled Defendant Brown with her "second warning" and ordered her to get her belongings and "leave this premises."[3] The speaker was then free to continue her criticism of Plaintiff Brown as she was being escorted out by law

---

[2] See City of Killeen City Council Meeting Video, Tuesday, September 17, 2024, at the 02:28:25 mark, https://killeen.granicus.com/player/clip/777?view_id=2&redirect=true.
[3] See City of Killeen City Council Meeting Video, Tuesday, September 17, 2024, at the 02:38:45 mark, https://killeen.granicus.com/player/clip/777?view_id=2&redirect=true.

enforcement officers.  Finally, Defendant Nash-King cut off the supportive speaker not because she was violating rules of decorum, but to "take a break while they take Ms. Brown out."  Not once in her nearly dozen mentions of Plaintiff Brown by name did a single Defendant correct the speaker.  Additionally, this supportive speaker of Defendants asked for, and received, and additional minute to shower praises upon Defendants – something Plaintiffs are rarely afforded when being critical.

A follow-up speaker was able to speak disparagingly about Plaintiff Fornino and when he brought it to Defendant Nash-King's attention that the supportive speaker was violating rules of decorum, she instead gaveled Plaintiff Fornino with his "first warning."[4]  The next speaker began talking specifically about Plaintiff Brown, a violation of the "rules of decorum," but Defendant Nash-King did not gavel him down.

Content-based policies are presumptively invalid. *Simon & Schuster, Inc. v. Members of N. Y. State Crime Victims Bd.*, 502 U.S. 105, 115, 116 L. Ed. 2d 476, 112 S. Ct. 501 (1991); *id.*, at 124 (KENNEDY, J., concurring in judgment); *Consolidated Edison Co. of N. Y. v. Public Serv. Comm'n of N. Y.*, 447 U.S. 530, 536, 65 L. Ed. 2d 319, 100 S. Ct. 2326 (1980); *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95, 33 L. Ed. 2d 212, 92 S. Ct. 2286 (1972).  Content discrimination "raises the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace," *Simon & Schuster*, 502 U.S. at 116; *Leathers v. Medlock*, 499 U.S. 439, 448, 113 L. Ed. 2d 494, 111 S. Ct. 1438 (1991); *FCC v. League of Women Voters of Cal.*, 468 U.S. 364,

---

[4] See City of Killeen City Council Meeting Video, Tuesday, September 17, 2024, at the 02:43:10 mark, https://killeen.granicus.com/player/clip/777?view_id=2&redirect=true.

383-384, 82 L. Ed. 2d 278, 104 S. Ct. 3106 (1984); *Consolidated Edison Co.*, 447 U.S. at 536; *Police Dept. of Chicago v. Mosley*, 408 U.S. at 95-98. The First Amendment does not permit Defendants to impose special prohibitions on those speakers who express views on disfavored subjects. See *Simon & Schuster*, 502 U.S. at 116; *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 229-230, 95 L. Ed. 2d 209, 107 S. Ct. 1722 (1987). "The point of the First Amendment is that majority preferences must be expressed in some fashion other than silencing speech on the basis of its content." *R.A.V. v. St. Paul*, 505 U.S. 377, 392 (1992).

## II.     The Supreme Court has Already Spoken

To bring this Sur-Reply to its boiling point and put Defendants on notice that their actions have already been deemed plausible by a court of competent jurisdiction, Plaintiffs cite the *Lozman* case. *Lozman v. City of Riviera Beach*, 585 U.S. 87 (2018). Lozman faced the very same issues that Plaintiffs here have suffered and continue to suffer.

In November 2006, the City of Riviera Beach City Council held a public meeting. The agenda included a public-comment session in which citizens could address the Council for a few minutes. As he had done on earlier occasions and would do more than 200 times over the coming years, Lozman stepped up to the podium to give remarks. He began to discuss the recent arrest of a former county official. One of the Councilmembers interrupted Lozman, directing him to stop making those remarks. Lozman continued speaking, this time about the arrest of a former official from the city of West Palm Beach. The Councilmember then called for the assistance of the police

officer in attendance. The officer approached Lozman and asked him to leave the podium. Lozman refused. The officer handcuffed Lozman and ushered him out of the meeting. The incident was recorded on video and could easily be confused with the actions of Defendants in this case without context.[5] According to the City, Lozman was arrested because he violated the City Council's rules of procedure by discussing issues unrelated to the City and then refused to leave the podium. According to Lozman, the arrest was to retaliate for his open-meetings lawsuit against the City and his prior public criticisms of city officials. Sound familiar? Plaintiffs could easily replace their names with Lozman and Defendants' names with the Councilmember.

The City argued that because Lozman was arrested, the City did not nothing wrong. "A citizen who suffers retaliation by an individual officer can seek to have the officer disciplined or removed from service, but there may be little practical recourse when the government itself orchestrates the retaliation. For these reasons, when retaliation against protected speech is elevated to the level of official policy, there is a compelling need for adequate avenues of redress." *Id.* at 100.

Like Lozman, Plaintiffs' "speech is high in the hierarchy of First Amendment values." *Id.* at 101; See also *Connick v. Myers*, 461 U. S. 138, 145, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983). The *Lozman* Court recognized the Plaintiff's right to seek redress on very similar grounds almost identical to the case before this Court.

### III. State Law Has Spoken

---

[5] See Record, Def. Exh. 505, Doc. 687, available at
https://www.supremecourt.gov/media/video/mp4files/Lozman_v_RivieraBeach.mp4.

Defendants claim that they censored speech because it was "off agenda" just as in Lozman. The difference is that, even if we were to agree that Plaintiffs' speech was "off agenda," Texas law specifically authorizes members of the public to speak on issues that aren't included in the agenda and the proper response of government officials in such instances. Tex. Gov. Code § 551.042(a) and (b). Defendant City of Killeen rules of decorum forbid members of the public from exercising that right to inquire about a subject that isn't on the agenda. As such, the policy itself is in violation of State Law and unenforceable. Tex. Loc. Gov. Code 51.002 specifically prohibits a municipality from adopting, enforcing, or maintaining an ordinance **or rule** that is inconsistent with state laws. Additionally, Texas law prohibits "public criticism of the governmental body, including criticism of any act, omission, policy, procedure, program, or service." Tex. Gov. Code § 551.007(e).

While Plaintiffs maintain that their speech was always on agenda and that Defendants simply censored them because of the manner in which they spoke on the agenda item because it was critical of defendants, even if they were off agenda, Defendants were powerless to engage in the conduct they are accused of here (and continue to engage in).

Defendants reply that state law is "far from creating some right for a member of the public to speak at a government meeting on any topic that the member of the public chooses," but that is exactly what the law does.[6] In fact, the Defendants' own words

---

[6] Defendants' Reply in Support of Rule 12(b)(6) Motion to Dismiss, page 2.

13
12(b)(6) Sur-Reply to Defendants' Response – Everard v. Killeen

betray their argument because they admit that "if a member of the public happens to make an inquiry about a matter not on the agenda" there is a mechanism for the government body to "provide some commentary."  It goes without saying that the plain text of the Open Meetings Act allows members of the public to broach non-agenda topics, but only gives the government entity limited options for response.  None of those options include "shut down the speech and trespass the person from the property."  The Code "creates a right for the government body" (as indicated in their reply) only to provide "a statement of specific factual information given in response to the inquiry,"  or recite "existing policy in response to the inquiry," or to deliberate or decide whether "the subject of the inquiry shall be limited to a proposal to place the subject on the agenda for a subsequent meeting." Tex. Gov. Code § 551.042.

Defendants have plainly engaged in viewpoint discrimination.  As will be shown in the evidence once this case is able to move forward, Defendants are quick to silence critics who are allegedly "off agenda"  - even when they are not – but rarely do so for their supporters.  Contrary to Defendants' claim that "the City of Killeen has done no more than impose view-point neutral rules for its city council meetings," viewpoint discrimination is the policy of Defendants.  It is the motivation of Defendants.  It is the agenda of Defendants.  The evidence will clearly show this discriminatory and retaliatory conduct through hours and hours of public testimony.

    **IV.**    **Plaintiffs Have no First Amendment Protections during Public Comment**

Finally, and briefly, Defendants again falsely claim that "Plaintiffs have not pled facts to support that any of them experienced a First Amendment violation." The entire complaint is a laundry list of First and 14th Amendment violations. This Sur-Reply highlighted several more. Only this Court can stop the gaslighting by Defendants and move this case into Discovery.

## CONCLUSION

Because Plaintiffs have provided ample plausible claims on which relief can be granted and have substantially pled facts to show that their constitutionally protected rights have been violated, that declaratory relief is proper in this case, and that it has overcome the burdens of proving *Monell* liability, the Court should deny Defendants' Motion to Dismiss under the Fed. R. Civ. P. 12(b)(6) and order that the parties immediately begin discovery.

Respectfully Submitted,

LAW OFFICES OF CJ GRISHAM PLLC

**CJ GRISHAM**
Texas State Bar No. 24124533
cj@cjgrisham.com
3809 S. General Bruce Dr.
Ste 103-101
Temple, Texas 76502
Telephone: 254-405-1726
**COUNSEL FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

      The undersigned hereby certifies that a true and correct copy of the above and foregoing Plaintiffs' Sur-Reply to Defendants' Reply in Support of Rule 12(b)(6) Motion to Dismiss was served by way of the Court's CM/ECF system and by email to the offices of counsel for Defendants, Roy L. Barrett and Joe Rivera of Naman, Howell, Smith & Lee, PLLC, 400 Austin Avenue, Suite 800, Waco, Texas 76701 on this 18th day of September, 2024.

_____
CJ Grisham